**Edley M. HIXSON, Jr. and Susan Elizabeth Hixson,**

v.

**The LIBERTY CORPORATION.**

No. 95–1091.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

May 15, 1997.

---

Thomas M. Bergstedt, Van Clifton Seneca, Bergstedt & Mount, Lake Charles, LA, for Plaintiffs.

Paul M. Adkins, Blanchard Walker Oquin & Roberts, Shreveport, LA, for Defendant.

## MEMORANDUM RULING

TRIMBLE, District Judge.

Presently before the court are cross Motions for Summary Judgment, petitioning the court for summary disposal of a case arising under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The parties seek review of an adverse decision by the plan administrator of an ERISA qualified pension plan, which denied the demand of plaintiffs, Edley M. Hixson, Jr. and Susan E. Hixson ("Hixsons"), for a lump sum payment of plaintiffs' vested retirement benefits. For the reasons stated below, the court grants summary judgment in favor of defendant, The Liberty Corporation ("Liberty").

### I. Findings of Fact

This dispute arose out of the ashes of a merger by and between Magnolia Life Insurance Company ("Magnolia") and Liberty. Magnolia maintained a qualified retirement plan ("Plan") for the benefit of its employees. The Plan provided participants with a lifetime annuity at retirement and also afforded those terminated prior to retirement with the option of receiving their accrued benefit in a lump sum.[1]

Prior to consummating the merger, Liberty conducted due diligence to determine the solvency of the Plan. Liberty determined that the Plan was properly funded to pay Plan participants their benefits in the form of an annuity at retirement. Liberty also dis-

---

1. Section 5.7(b) provided in relevant part:
"In the event a married Participant duly elects ... not to receive the retirement benefit in the form of a joint and survivor annuity, or if such Participant is not married, in the form of a life annuity, the Administrator in his sole discretion shall direct the Insurer to distribute to a Participant or his beneficiary an amount which is the Actuarial Equivalent of the monthly retirement benefit ... in one or more of the following methods:
I. One lump-sum payment in cash or in property."

covered that the plan would be rendered insolvent, if all employees, terminated as a result of the merger, exercised the lump sum payment option. In an effort to forestall this eventuality, Liberty prevailed on Mr. Hixson, President, director and 15% owner of Magnolia (Bunton Aff. at 2), to delay his election of a lump-sum distribution, until such time that Liberty could properly fund the plan.[2] Despite the fact that Mr. Hixson was a fully vested participant in the Plan as of October 1, 1992 (Bunton Aff. at 2), he agreed to Liberty's request.

On October 1, 1992, the merger of Magnolia and Liberty became effective. Shortly thereafter, Liberty sought advice from a consulting firm, Booke & Company, regarding alternative payment options, other than the lump-sum distribution, which would enable Liberty to maintain the solvency of the Plan.[3] Alvin L. Jones, Vice President and Actuary of Book & Company, confirmed Liberty's obligation to continue to provide Plan participants with the option of a lump-sum distribution.[4] Mr. Jones further suggested, however, that Liberty could minimize its liability under the lump-sum option by limiting such distributions to those within a certain, specified amount, as long as the "cap" was consistent with Magnolia's historic practices.[5]

At a special meeting of the Board of Directors of Magnolia on December 11, 1992,[6] the Magnolia Board adopted an amendment to the Magnolia Life Retirement Plan. The amendment terminated any further participation under the Plan, including benefit accruals, and "clarif[ied]" the Plan policy regarding the payment of lump-sum distributions upon early retirement.[7] The Magnolia Board enacted a cap on lump-sum distributions based upon the age of the participant and the amount of the participant's accrued benefit. If the present value of participant's accrued benefit exceeded a certain amount, no portion of the benefit would be available for distribution as a lump sum. For those under the age of 55, a lump-sum payment was available only if the present value of the accrued benefit was less than or equal to $10,000.00. For those age 55 and above, the lump sum pay-

2. Defendant argues that, pursuant to an order of this court, we may not consider Mr. Hixson's conversations with Ralph Ogden, President of Liberty, in which Mr. Ogden asked Mr. Hixson to delay his election for a lump-sum distribution. Consistent with the court's motion in limine, we will not consider any representations made to Mr. Hixson, or to his wife, to supplement our understanding of the Plan provisions. The court does, however, consider such evidence to refute any inference that Mr. Hixson's opportunity to make a lump-sum election had proscribed after Magnolia amended the Plan in 1992.

3. In a letter, dated October 9, 1992, from Liberty Assistant Vice President Mary Anne Bunion to Roy Sinclair, a Senior Vice President of Booke & Company, Ms. Bunton summarized Liberty's need for advice as follows:

"What we are seeking from Booke are alternatives to deal with the underfunded termination liability which seems to hinge around the fact that Magnolia permitted and, in fact, paid out lump sum payments to retirees and terminated employees."

4. In a letter, dated October 15, 1992, from Alvin L. Jones, Vice President and Actuary of Booke & Company, to Liberty, Mr. Jones advised Ms. Bunton:

"Yes, you are required to continue lump sum payments upon termination of employment because of past practice. Also the current plan

document and summary plan description, outline this form of payment."

5. Mr. Jones further advised Ms. Bunton:

"You could minimize the impact of paying lump sums by capping the amount that can be paid in a lump sum. This cap should be determined by reviewing past lump sums payments and setting the cap at a level higher than the largest amount paid in the plan. For example, if the largest amount in the past was $50,000, this amount would serve as the lump sum cap."

6. Pursuant to the merger, effective October 1, 1992, Liberty did not dissolve Magnolia, but kept the company intact. Mr. Ogden, as Chairman of the Board of Magnolia, was authorized to execute the first amendment to the Plan. This is not in dispute.

7. The "whereas" clause of the Amendment succinctly states the purpose of the amendment:

"WHEREAS, there has been presented to the meeting a copy of the First Amendment to the Magnolia Life Retirement Plan, which accommodates the acquisition of Magnolia Life Insurance Company by the Liberty Corporation and further ceases benefit accruals and participation under the Plan as well as clarifying the administrative policy regarding the payment of lump sums and certain other ministerial policies under the Plan."

ment benefit was less than or equal to $10,000.00. For those age 55 and above, the lump sum payment option was available only if the present value of the accrued benefit was less than or equal to $75,-000.00. The changes to the Plan embodied in the amendment were applied retroactively with an effective date of January 1, 1989.

Mr. Hixson was one of three Magnolia employees aged 55 and above who was affected by the Plan amendment. In late 1994, Mr. Hixson requested a lump-sum distribution,[8] and was informed that he was ineligible for such a lump-sum distribution. Mr. Hixson insisted on a lump sum distribution. After unsuccessful resolution of this dispute, Mr. Hixson brought the above-captioned suit in the 14th Judicial District, Parish of Calcusieu, State of Louisiana on or about May 30, 1995. Liberty timely removed the action to this court on or about June 23, 1995. As ERISA completely preempts the field, it provides the requisite basis for removal jurisdiction under 28 U.S.C. § 1441.[9] Federal jurisdiction exists pursuant to 28 U.S.C. § 1331. Venue is proper in the Western District of Louisiana. 28 U.S.C. § 1391.

## II. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the non-movant would bear the bur-

den of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Transamerica Insurance Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995) (citations omitted).

In deciding a summary judgment motion, the district court may consider all competent summary judgment evidence in the entire case file. *Resolution Trust Corp. v. Starkey,* 41 F.3d 1018, 1023 (5th Cir.1995); *United States v. Houston Pipeline Co.,* 37 F.3d 224, 227 (5th Cir.1994).

## III. Law and Analysis

### A. Standard of Review

■ The parties in this case both agree that the Plan qualifies as an employee welfare plan under ERISA. *McDonald v. Provident Indemnity Life Ins. Co.,* 60 F.3d 234, 236 (5th Cir.1995). Our threshold inquiry, therefore, is whether the plan administrator premised his decision on a factual determination or a plan determination. On the basis of defendant's analysis of the standard of review, Liberty apparently contends that the plan administrator's decision hinged on a plan interpretation. Although plaintiff fails to address this question, the Hixsons' reliance on evidence outside the administrative record indicates that plaintiffs consider plan interpretation to be a central inquiry in the case. *Southern Farm Bureau Life Ins. Co. v. Moore,* 993 F.2d 98, 102 (5th Cir.1993) (holding that in reviewing a plan administrator's factual determination, the court is limit-

---

**8.** In 1994, Mr. Hixson's lump-sum accrued benefit was $358,307.12; in 1997, the accrued benefit is worth § 378,313.21

**9.** Ordinarily, preemption of state law by federal law is a defense to a plaintiff's state law claim, and therefore cannot support federal removal jurisdiction under the "well-pleaded complaint" rule. "Complete preemption," in contrast, exists when the federal law occupies an entire field,

rendering any claim a plaintiff may raise necessarily federal in character. Because ERISA preemption is so comprehensive, it can provide a sufficient basis for removal to federal court even though it is raised as a defense, notwithstanding the "well-pleaded complaint" rule. *Hubbard v. Blue Cross & Blue Shield Ass'n,* 42 F.3d 942, 945 (5th Cir.), *cert. denied,* ── U.S. ──, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1985) (citations omitted).

ed to the evidence that was before the plan administrator). These facts, combined with the parties' focus on the effect of the 1992 Plan amendment, provides the court with sufficient basis to conclude that the plan administrator's decision was a plan term interpretation.

■ In reviewing a denial of benefits claim based upon a plan interpretation, the court applies a *de novo* standard, "unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Ramsey v. Colonial Life Insurance Co.,* 12 F.3d 472 (5th Cir.1994); *Pierre v. Connecticut General Life Insurance Co.,* 932 F.2d 1552, 1556 (5th Cir.1991), *cert. denied,* 502 U.S. 973, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). If, on the other hand, the plan grants authority to the administrator to make a final and conclusive determination of the claim, then the plan administrator's decision is reviewed under an abuse of discretion or "arbitrary and capricious" standard. *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1305 (5th Cir.1994).

■ Here, Liberty points to Section 2.6 of the Plan, entitled Powers and Duties of the Administrator, to demonstrate that the plan administrator had discretion to make final benefit determinations. Section 2.6 provides that:

"[t]he administrator shall administer the Plan in accordance with its terms and shall have the power to determine all questions arising in connection with the administration, interpretation, and application of the Plan. [A]ny such determination by the Administrator shall be conclusive and binding upon all persons."

Although no "magic phrase" or incantation is required to confer discretionary authority on the plan administrator, *Haubold v. Intermed-*

ics, *Inc.,* 11 F.3d 1333, 1337 (5th Cir.1994) (the exercise of "sound judgment" is sufficient to confer discretionary judgment), Section 2.6 leaves little doubt of the plan administrator's discretion. Accordingly, the court applies an abuse of discretion analysis.[10]

■ The abuse of discretion standard involves a two-step inquiry. *Pickrom v. Belger Cartage Service, Inc.,* 57 F.3d 468, 471 (5th Cir.1995). First, a court must determine a plan's legally correct interpretation. *Chevron Chemical Co. v. Workers Union 4–447,* 47 F.3d 139, 145 (5th Cir.1995). If the administrator's interpretation was not the legally correct interpretation, then the court must determine whether the administrator's decision was an abuse of discretion. *Id.* In determining whether the administrator's decision was legally correct we consider: (1) whether the administrator's interpretation is consistent with a fair reading of the plan; (2) whether the administrator has given the plan a uniform construction; and (3) whether the interpretation results in any unanticipated costs to the plan. *Chevron,* 47 F.3d at 145.

## B. *Effectiveness of Magmolia's Plan Amendment*

■ In 1994, the Plan administrator denied Mr. Hixson's claim for a lump-sum distribution in light of the 1992 plan amendment. As such, the first issue that we must address is whether defendant's plan amendment is effective. In 1988, regulations were promulgated which prohibited the exercise of employer discretion in providing plan participants with optional benefit forms. 26 C.F.R. § 1.411(d)–4, Q & A 1(b)(2) and 8(c). These regulations prompted many employers to amend their ERISA plans. In doing so, employers also had to comply with Section 204(g) of ERISA, which prohibits retroactive reduction or elimination of accrued benefits, including the elimination of optional forms of benefits. 29 U.S.C. § 1054(g).[11]

---

**10.** The Fifth Circuit has used the terms "abuse of discretion" and "arbitrary and capricious" relatively interchangeably. In *Salley v. E.I. DuPont de Nemours & Co.,* 966 F.2d 1011 (5th Cir.1992), the court made a subtle distinction between the terms when it held: "in applying the abuse of discretion standard, the court must analyze whether the plan administrator's decision was arbitrary and capricious." 966 F.2d at 1014.

**11.** Lump sum distributions qualify as an optional form of benefits. *Auwarter v. Donohue Paper Sales Ben. Pension Plan,* 802 F.Supp. 830, 840 (E.D.N.Y.1992) (citing Treas. Reg. § 1.411(d)–4).

In order to mitigate the potentially harsh effects of these two regulations, employers were provided with three choices, available oily during a limited time period: (1) to eliminate the optional form of benefit; (2) to make the optional form of benefit available to all participants without limitation; and (3) to apply objective and non-discriminatory conditions to the availability of such benefits. *Counts v. Kissack Water and Oil Service, Inc.*, 986 F.2d 1322, 1324 (10th Cir.1993) (citing 26 C.F.R. § 1.1411(d), Q & A(b)); *Auwarter*, 802 F.Supp. at 838 (same).

The regulations required the employer to choose an alternative on the first day of the first plan year after January 1, 1989. *Counts*, 986 F.2d at 1324 (citing 26 C.F.R. § 1.411(d)–4, Q & A 8(c)(1) and 9(c)(2)). The regulations further provided that the employer amend the plan by a certain date to reflect the employer's selection. *Id.* "Failure to choose one of the three alternatives consistent with these dates will result in an unlawful elimination of an optional benefit." 26 C.F.R. § 1.411(d)–4, Q & A 8(d). Also, the employer practice during the period from the effective date to the date of amendment had to be consistent with the employer's amendment. *Auwarter*, 802 F.Supp. at 838 (citing 26 C.F.R. § 1.411(d)–4, Q & A 8(c)).

Plaintiffs first argue that the Plan amendment was unnecessary, because the Plan did not provide Magnolia with discretion to determine the availability of the lump-sum "optional form of benefit." Section 5.6 of the Plan provided: "Administrator may, in accordance with a nondiscriminatory policy, direct earlier payment of the entire vested portion of the Present Value of Accrued Benefit." The court agrees with defendant that the word 'may' vests discretionary power in the administrator; it is unnecessary that the Plan language specifically state that an administrator has discretion for it to be so.

Plaintiffs, however, argue further that Section 5.6 complied with mandates of 26 C.F.R. § 1.1411(d), Q & A(b) even prior to the enactment of the 1992 amendment. As stated above, employers had three alternatives during the interim period, one of which enabled the employer to continue to provide participants with an optional form of benefit as long as the benefit's availability was governed by an objective and non-discriminatory policy. A careful reading of section 5.6, focusing on the phrase, *"in accordance with a nondiscriminatory policy,"* demonstrates that the Magnolia plan did just that, by requiring the administrator to adhere to a nondiscriminatory policy in providing benefits to the Plan participants. The court recognizes the merit of this argument. The argument, however, has little bearing on the ultimate disposition of this case in light of the court's conclusion, discussed herein, that Magnolia's 1992 amendment was ineffective.

Plaintiff next argues that Liberty failed to amend the Plan within the deadline established by 26 C.F.R. § 1.411(d)–4, Q & A 8(c)(1) and 9(c)(2). According to Section 1.32 of the Plan, the first day of the Plan year is January 1, and, therefore, the deadline for defendant's election was January 1, 1989. Defendant amended the Plan on October 9, 1992, over ten months after the January 1, 1989, deadline. Defendant contends that an employer can comply with the deadline in the regulations by demonstrating that Plan practice was consistent with the amendment and by amending the Plan within the deadline established by the regulations. Defendant asserts that its Plan practice was consistent with the 1992 amendment; Liberty has never made a lump-sum distribution to any terminated participant pursuant to the Plan in excess of $75,000.00. (Bunton Aff. at 2). Additionally, the parties do not dispute that Magnolia amended the Plan within the deadline established by the regulations.

Liberty concedes, however, that this argument conflicts with the interpretation afforded the Treasury Regulations by the Tenth Circuit in *Counts*, and a district court in the Second Circuit in *Auwarter*. Both courts determined that the regulations require an employer to affirmatively select one of the three alternatives prior to the first day of the first plan year after January 1, 1989, in order to achieve "operational compliance" with the regulations. *Counts*, 986 F.2d at 1325 ("We hold that an employer may not be deemed to have achieved operational compliance with 26 C.F.R. § 1.411(d)–4, Q & A 8(c)(1) through mere inaction. Rather, the employer must

have taken some affirmative step to formalize its selection, and consequently, to create an enforceable right in favor of the plan participants."); *Auwarter,* 802 F.Supp. at 839 (same).

In *Auwarter,* the employer failed to take affirmative steps to select one of the alternatives by the deadline. The defendant argued, nevertheless, that it had complied with the regulations, because it had not granted any lump sum distributions during the relevant interim period. In rejecting this argument, the court noted that there were no other plan members, aside from the plaintiffs, at or near retirement age, and therefore, defendant's Plan practice reflected the needs of its Plan beneficiaries, not any conscious decision on its part not to grant lump sum distributions. *Auwarter,* 802 F.Supp. at 839.

The same is true in the instant case. Liberty claims that it complied with the regulations, because Magnolia had not paid any Plan participant a lump sum early retirement benefit in excess of $75,000. Previously, all Plan participants, entitled to early retirement benefits, had received a lump sum without regard to the amount due and owing to the Participant.[12] As a result, defendant's operational compliance is pure happenstance. Plaintiffs are the first Plan participants to claim a lump-sum distribution in excess of $75,000. As such, even were this court to accept Liberty's interpretation of the regulations, which we do not, we conclude that Liberty's "practice" did not reflect defendant's compliance with the regulations, but, rather, its Plan beneficiaries' demands prior to plaintiffs' election for a lump-sum distribution.

Although this court is not *Erie* bound by a Tenth Circuit court, or, for that matter, by a court in the Eastern District of New York, we find the interpretation of *Counts* and *Auwarter* persuasive. The court, therefore, rejects defendant's position, and finds that defendant's 1992 amendment was ineffective. Accordingly, the plan administrator's legal interpretation of the Plan, relying as it did on the 1992 amendment, was incorrect. This does not, however, end our analysis.

## C. Lump–Sum Distributions to Highly Compensated Employees

Sections 401(a)(4) and 411(d) of the Internal Revenue Code ("IRC") prohibit qualified retirement plans from discriminating in favor of highly compensated employees ("HCE"). *Sikorski v. Sikorski,* 930 F.Supp. 804, 810 (E.D.N.Y.1996). IRC section 411(d)(6) also prohibits retroactive plan amendments to eliminate optional forms of benefits. *Id.* An optional form of benefit may be reduced or eliminated, however, if such a reduction is necessary to affect compliance with the nondiscrimination rules of I.R.C. § 401(a)(4). *Sikorski,* 930 F.Supp. at 812 (citing Rev. Rul. 92–76, 1992–2 C.B. 76). "[T]he amendment of a plan to replace plan provisions that complied with section 1.401–4(c) with provisions that complied with section 1.401(a)(4)–5(b) is not deemed to be a violation of section 411(d)(6)." *Id.*

In light of the above stated standard, the court concludes that Liberty's refusal to make a lump sum distribution to the Hixsons is justified by its need to comply with the prohibitions of section 1.401(a)(4)-b(5) against discrimination in favor of highly compensated employees. As a threshold matter, Mr. Hixson qualifies as an HCE,[13] and as a restricted employee,[14] thereby sub-

---

**12.** In deposition, the Plan's previous administrator, testified that:

"Magnolia's practice was always to lump sum people out ... everybody vested would always be lumped out 100 percent if they requested it at the time of their termination."

**13.** Mr. Hixson owned 15% of Magnolia's stock, earned $298,000.00 in 1992 and was one of the 25 highest compensated employees in 1992. (Bunton Aff. at 2). As such, he qualified as a "highly compensated employee." IRC section

424(q) (ownership of 5 percent of a company's stock, or compensation in excess of $93,518, or status as one of 25 of the highest paid employees in any one year qualifies an individual as a highly compensated employee).

**14.** Treasury Regulation section 1.401(a)(5)–5(b) provides in relevant part:

"*Restricted employee defined.* For the purposes of this paragraph (b), the term restricted employee generally means any HCE or former HCE ..."

jecting any distribution made to him to the requirements of 1.401(a)(4)–5(b).

There are exceptions to this rule against favoring an HCE in a distribution. An employer may make a distribution to an HCE, if (1) after distribution the assets would be greater than or equal to 110 percent of the liabilities, (2) the total distribution is less than one percent of total assets, or (3) the total distribution is less than $3,500.00.[15] According to data provided to the court by defendant for plan years 1994 through 1996, a distribution to the plaintiffs would not fall within any of the delineated exceptions. In 1994, Liberty had assets of $2,047,270.00, current liabilities of $2,447,870, and a lump sum amount payable to plaintiffs of $358,-307.12; the asset/liability ratio equaled 83.6 percent, the lump sum amount exceeded one percent of current liabilities and was greater than $3,500. In 1995, Liberty had assets of $5,975,115.00, current liabilities of $5,500,310, and the lump sum amount payable to plaintiffs of $311,292.08; the asset/liability ratio equaled 108.6 percent, the lump sum amount exceeded one percent of current liabilities and was greater than $3,500.00. In 1996, Liberty had assets of $5,998,546, current liabilities of $6,544,232, and the lump sump amount payable to plaintiffs of $395,101.34; the asset/liability ratio was 109.1 percent, the lump sum amount exceeded one percent of current liabilities and was greater than $3,500.00.

Accordingly, "[i]n the court's view, the defendant's refusal to grant [plaintiffs] a lump sum distribution constitutes nothing more than compliance with these rules during the remedial period." *Sikorski*, 930 F.Supp. at 812. This court concurs with the reasoning and conclusion of the *Sikorski* court. *Id.* (holding that the plaintiff was not entitled to a lump sum distribution where such a distribution would violate section 1.401(a)(4)–5(b), by favoring a highly compensated employee). Despite our conclusion that the amendment was ineffective, the court concludes that the administrator's decision was not an abuse of discretion. See *Sikorski, supra.*

Plaintiffs argue, however, that *Sikorski* is inapposite to the instant case. Plaintiff contends that this case is factually distinguishable from *Sikorski*. Although plaintiff is correct that the facts of *Sikorski* are different in several aspects from the instant case, plaintiff fails to prove that a distribution to plaintiffs would fall within one of three recognized exceptions to the prohibition against discriminating in favor of HCEs in making a distribution under a qualified plan. Additionally, the court notes that *Sikorski* examines an employer's responsibility in making distributions to HCEs under the provisions of section 1.401(a)(4)–5(b). The prohibitions of that regulation apply equally to the plaintiff here as the plaintiff in *Sikorski*, despite the factual differences in the two cases.

## D. Attorney's Fees

■ Plaintiffs also seek reimbursement for the attorney's fees incurred by Mr. Hixson in his attempt to obtain payment of his lump-sum benefits. Under ERISA, "the court in its discretion may allow a reasonable attorneys' fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In determining whether to award attorneys' fees, the court must consider the following five factors: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would

---

**15.** Treasury Regulation section 1.401(a)(5)–5(b) provides in relevant part:

"Nonapplicability in certain cases. The restrictions in this paragraph (b)(3) do not apply, however, if any one of the following requirements is satisfied:

"(A) After taking into account payment to or on behalf of the restricted employee of all benefits payable to or on behalf of that restricted employee under the plan, the value of plan assets must equal or exceed 110 percent of current liabilities, as defined in section 412(7).

(B) The value of the benefits payable to or on behalf of the restricted employee must be less than one percent of the value of current liabilities before distribution.

(C) The value of the benefits payable to or on behalf of the restricted employee must not exceed the amount described in section 411(a)(11)(A) (restrictions in certain mandatory distributions)."

deter other parties under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself, and (5) the relevant merits of the parties' position. *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir.1995) (citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir.1980)). In the Fifth Circuit, there is no presumption in favor of awarding attorneys' fees. *Todd, supra.*

In applying the above-listed factors, we conclude that the plaintiff is not entitled to an award of attorneys' fees. There is no evidence in the record that the defendant acted in bad faith. The defendant concedes that it has the ability to pay attorneys' fees. Because this court does not find bad faith on the part of the defendant, an award of fees would not serve to deter future negative conduct. Moreover, the plaintiff's suit was limited to the vindication of his own claims under the Plan and did not address or resolve significant or novel legal questions regarding ERISA. Finally, both parties marshaled legitimate arguments in support of their cases, and neither argued a demonstrably stronger or more meritorious case. Thus, this court declines to award attorneys' fees or costs in favor of the plaintiffs.

Accordingly, defendant's motion for summary judgment will be GRANTED, and plaintiffs' motion for summary judgment will be DENIED. In addition, plaintiffs' motion for attorney's fees will also be DENIED.